UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JEFFREY HERRING,<br><br>                    Petitioner,<br><br>        v.<br><br>UNITED STATES OF AMERICA,<br><br>                    Respondent. | No. 20-CV-9752 (KMK) |
| UNITED STATES OF AMERICA<br><br><br>        v.<br><br>JEFFREY HERRING,<br><br>                    Defendant. | No. 16-CR-302 (KMK)<br><br><u>ORDER</u> |

KENNETH M. KARAS, United States District Judge:

　　Jeffrey Herring ("Herring" or "Petitioner"), proceeding pro se, has filed a Petition for a

Writ of Habeas Corpus (the "Petition"), pursuant to 28 U.S.C. § 2255, to vacate, set aside, or

correct his conviction.  (*See generally* Pet. for Writ of Habeas Corpus ("Pet.") (Dkt. No. 1, 20-

CV-9752; Dkt. No. 184, 16-CR-302).)[1]  In the Petition, Herring argues that his counsel was

ineffective with respect to plea discussions and that Hobbs Act robbery does not constitute a

---

[1] Certain of the Parties' papers were filed on Petitioner's criminal docket, Case No. 16-CR-302, and certain on Petitioner's civil docket, Case No. 20-CV-9752.  The docket citations indicate on which docket each document was filed.

crime of violence for purposes of 18 U.S.C. § 924(j).  (Pet. 4–5.)[2]  For the foregoing reasons, the Petition is denied.

## I.  Background

### A.  Factual Background

#### 1. Indictments

On or about May 4, 2016, Indictment S1 16 Cr. 302 was filed charging Herring, and others, in three counts.  (*See* Sealed Indictment 1–3 (Dkt. No. 4, 16-CR-302).)  Count One charged Herring with participating in a robbery conspiracy in or about October 2015, in violation of Title 18, United States Code, Section 1951.  (*Id.* at 1.)  Count Two charged Herring with participating in the robbery of Michael Northcote on or about October 12, 2015, in violation of Title 18, United States Code, Sections 1951 and 2.  (*Id.* at 2.)  Count Three charged Herring with the murder of Michael Northcote through use of a firearm on or about October 12, 2015, in violation of Title 18, United States Code, Sections 924(j) and 2.  (*Id.* at 2–3.)

Superseding Indictment S6 16 Cr. 302 was filed on February 27, 2017, charging Herring in five counts.  (*See* Superseding Indictment 1–9 (Dkt. No. 40, 16-CR-302).)  Counts One through Three contained the same charges from the S1 Indictment.  (*See id.* at 1–3.)  Count Four charged Herring with participating in a racketeering conspiracy as part of the Askari gang between in or about 2015 and May 2016, in violation of Title 18, United States Code, Section 1962(d).  (*Id.* at 3–7.)  Count Five, which carried a sentence of mandatory life imprisonment, charged Herring with the murder of Michael Northcote in aid of racketeering on October 12, 2015, in violation of Title 18, United States Code, Sections 1959(a)(1) and 2.[3]  (*Id.* at 7–9.)

---

[2] Unless otherwise noted, the Court cites to the ECF-stamped page number in the upper-right corner of each page.

[3] Superseding Indictment S11 16 Cr. 302 was filed on or about April 12, 2017, charging Petitioner in five counts with the same violations contained in the S6 Indictment, but with certain

## 2. Pre-Trial Communications

Before trial began, the Government did not provide a written plea offer to Troy A. Smith, Esq., who represented Herring throughout the proceedings in this case. (Gov't Mem. in Opp'n ("Gov't Opp'n"), Ex. A ("Smith Affidavit") ¶ 2 (Dkt. No. 10, 20-CV-9752; Dkt. No. 195, 16-CR-302).) Mr. Smith has provided an affidavit, which is attached as Exhibit A to the Government's Opposition, summarizing the discussions he had with both Herring and Government counsel about a possible disposition of the case. (*See generally id.*) In particular, Mr. Smith states that "the Government never conveyed a plea offer" to Mr. Smith during the pendency of this case, and "at no time did [Mr. Smith] ever convey to [Herring] that the Government agreed to enter into a cooperation agreement with [Herring] or that the Government conveyed a plea offer that included a sentence to confinement at 20 years." (*Id.* ¶ 2.)

In his Affidavit, Mr. Smith also relayed that the Government informed him in January 2017 of its intention to file a superseding indictment adding a charge that would carry a mandatory life sentence and further indicated that any plea would need to occur before the grand jury returned the superseding indictment. (*Id.* ¶ 3.) Although the Government never conveyed a formal plea offer, Mr. Smith was aware that one of Herring's co-defendant's, Mark Mack, had received a plea agreement carrying "a statutory maximum and guideline sentence of 40 years in confinement" and further understood that "any plea for [Herring] would be substantially more than this as [Herring] was alleged to have been the shooter responsible for the death of Michael Northcote." (*Id.*) The Government further offered to provide the

---

minor changes to the charging language. (*See* Superseding Indictment 1–9 (Dkt. No. 66, 16-CR-302).)

defendant with a "reverse proffer" of its evidence to "facilitate a plea discussion." (*Id.* ¶ 4.)

Thereafter, Mr. Smith met with Herring, conveyed his assessment that the applicable sentencing

range under the United States Sentencing Guidelines ("Guidelines") would be life imprisonment

even after a guilty plea, discussed potential arguments Herring could make at sentencing in

support of a below-Guidelines sentence, explained the Government's offer to provide a reverse

proffer, and explained that Herring would face a mandatory life sentence if convicted at trial.

(*Id.* ¶¶ 4–10.)  In response, Herring declined to attend a reverse proffer and indicated that was

not interested in a plea that would carry a sentence of more than 40 years' imprisonment. (*Id.*

¶ 10.)  Mr. Smith subsequently informed the Government that Herring was not interested in a

reverse proffer or any plea that would involve a sentence of more than 40 years' imprisonment.

(*Id.* ¶ 11.)  After receiving Herring's position as conveyed by Mr. Smith, on February 27, 2017,

the Government obtained a superseding indictment adding a charge carrying a mandatory life

sentence.  (*Id.*)  At no point thereafter did the Government extend a plea offer to Herring.  (*See*

*generally id.*)

### 3. Trial

Trial commenced on or about April 25, 2017.  (*See* Dkt. (16-CR-302) (minute entry for

proceedings held on 4/25/2017).)  The Government offered substantial evidence of Herring's

membership in Askari Gang (the "Askari"), and that, on October 12, 2015, in Swan Lake, New

York, Herring shot and killed Michael Northcote, a marijuana dealer, during a robbery at

Northcote's home.  The evidence offered at trial included, among other things, testimony from a

number of witnesses, including cooperating witnesses Jesse Hummel, William Lewis, and Mark

Mack, all of whom participated in the robbery, and pleaded guilty to charges related to the

robbery and felony murder of Northcote.  (*See* Tr. 61–256 (Hummel), 337–561 (Lewis), 660–

1016 (Mack).)  More specifically, Hummel and Mack testified that they were both involved in the Askari along with Herring.  (Tr. 64 (Hummel), 664 (Mack).)  Mack and Lewis testified that Lewis proposed the idea of robbing Northcote to Mack, who was the president of the Askari, and Mack further testified that he recruited other members of the Askari to participate in the robbery, including Herring, who was the sergeant at arms of the Askari, and who, along with other gang members, sold drugs, participated in shootings, and committed armed robberies.  (*See, e.g.*, Tr. 63 (Hummel), 65–67 (Hummel), 75 (Hummel), 104–15 (Hummel), 340–42 (Lewis), 670–71 (Mack), 683 (Mack), 769–87 (Mack)).)  All three cooperating witnesses testified that they, along with Herring and additional co-conspirators named Andrew Reynolds, Travis Davis, and Deanna Duncan, carried out the home-invasion robbery of Northcote, during which Herring shot Northcote in front of his son, resulting in his death.  (*See* Tr. 61–62 (Hummel), 84–91 (Hummel), 338–360 (Lewis), 661-662 (Mack), 734–38 (Mack).)  Cellphone and cell site records established that Herring and Mack communicated with Lewis and Reynolds, as they drove in separate cars to Northcote's home, and as they fled the scene after the robbery and murder.  (Tr. 625–59.)  Cell site records established that Herring's and Mack's phones were in the vicinity of Northcote's home one minute after the 911 call was placed from Northcote's home.  (*Id.*) Ballistics evidence further established that a .22 revolver that Lewis and Duncan attempted to get rid of after the murder was the same firearm used to shoot and kill Northcote.  (Tr. 1034–37.) The evidence at trial left no doubt that Herring was responsible for the murder of Northcote.

The Government also presented the testimony of law enforcement witnesses who responded to the scene of the robbery and murder, a ballistics expert who analyzed and discussed the murder weapon and bullets recovered at the scene, call records, cell site evidence, the 911 call following the murder, Herring's Askari vest, Askari badges, text messages

regarding Askari membership, and evidence obtained from Herring's Facebook page. (*E.g.* Tr. 55–56, 59–60, 266–289, 584–87, 321–23, 328, 611, 613–14, 625–59, 1018–19, 1034–37.)

Following the Government's case, Herring testified in his own defense. In his testimony, Herring admitted to being a member of the Askari and its sergeant at arms, and historically a member of the Bloods. (Tr. 1058–60, 1078.) Herring claimed that the Askari simply participated in charitable and community events and denied his knowledge of the Askari's participation in robberies, burglaries, use of firearms and drug dealing other than marijuana. (Tr. 1060–67, 1090–91, 1100–20.) Herring admitted to selling marijuana but denied participating in other crimes with the gang or possessing firearms. (Tr. 1060–63, 1092, 1100–03.) As for the Northcote robbery, Herring testified that this incident was the first time he heard of Askari members committing crimes of this nature. (Tr. 1160.) Herring further testified that he was approached by Mack to commit what he understood to be a burglary. (*Id.*) Herring testified that, on the night of the Northcote robbery and murder, he drove with the other members of the robbery crew to Northcote's home in the belief that they were going to commit a burglary, and when they discovered that Northcote was home, Herring remained in the car while everyone else carried out the robbery. (Tr. 1071–72, 1167–72.)

The defense also introduced several exhibits of Askari Facebook posts, as well as a stipulation regarding certain statements made by Mack, Lewis, and Hummel during meetings with the Government. (Tr. 1183–85, 1200–1204.)

Trial ended on May 9, 2017, when the jury returned a verdict convicting Herring on all counts. (*See* Jury Verdict as to Jeffrey Herring (16-CR-302).)

4. Sentence

In advance of sentencing, the Probation Office prepared a Pre-Sentence Report that calculated a Guidelines range of life imprisonment. (Final Presentence Report ("PSR") ¶ 90 (Dkt. No. 94).) That calculation was based on a base offense level of 43, because the offense involved first degree murder, and a two-point enhancement for obstruction of justice based on Herring's perjury at trial in this case. (PSR ¶¶ 36–45.) The Probation Office recommended a Guidelines sentence of life imprisonment. (PSR at 18.)

At sentencing on November 30, 2017, the Court sentenced Herring to life plus five years' imprisonment and a $500 mandatory special assessment. (Sentencing Tr. 15–16 (Dkt. No. 119, 16-CR-302).) Judgment was entered on January 25, 2018. (Judgment (Dkt. No. 104, 16-CR-302.)

B. Procedural History

After judgment was entered, Herring filed a direct appeal. (Not. of Appeal (Dkt. No. 106, 16-cr-00302).) That appeal did not raise any of the claims that Herring asserts in the instant Petition regarding plea negotiations or ineffective assistance of counsel. (*See generally* Appellant's Br., *United States v. Herring*, No. 18-336 (Dkt. No. 49) (2d Cir.).) Herring's direct appeal did, however, raise the same claim contained in the Petition challenging Herring's conviction on Count Three based on the suggestion that Hobbs Act robbery does not constitute a crime of violence. (*Id.* at 1–2, 29–31.)[4] On March 20, 2019, the Second Circuit issued a mandate affirming the defendant's conviction and rejecting all of his claims on appeal.

---

[4] Here, the Court cites to the page numbers as designated by the brief itself, rather than those generated by the Court's Electronic Case Filing system.

(Mandate, *United States v. Herring*, No. 18-336 (Dkt. No. 90) (2d Cir.); *see also* Mandate (Dkt.

No. 145, 16-cr-00302).)  Herring subsequently filed the instant Petition.  (*See* Pet.)

## II.  Discussion

### A.  Standard of Review

A prisoner in federal custody may move to vacate, set aside, or correct his sentence only

"upon the ground that the sentence was imposed in violation of the Constitution or laws of the

United States, or that the court was without jurisdiction to impose such sentence, or that the

sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral

attack."  28 U.S.C. § 2255(a).[5]  "Because collateral challenges are in 'tension with society's

strong interest in the finality of criminal convictions, the courts have established rules that make

it more difficult for a defendant to upset a conviction by collateral, as opposed to direct, attack.'"

*Yick Man Mui v. United States*, 614 F.3d 50, 53 (2d Cir. 2010) (quoting *Ciak v. United States*, 59

F.3d 296, 301 (2d Cir. 1995) (abrogated on other grounds by *Mickens v. Taylor,* 535 U.S. 162,

170 n.3 (2002))).  To prevail on a collateral attack of a final judgment under § 2255, a petitioner

must demonstrate either the existence of a "constitutional error . . . or an error of law or fact that

constitutes a fundamental defect which inherently results in a complete miscarriage of justice."

*United States v. Bokun*, 73 F.3d 8, 12 (2d Cir. 1995) (quotation marks omitted); *accord Cuoco v.*

_____

[5] 28 U.S.C. § 2255(a) provides, in full:

A prisoner in custody under sentence of a court established by Act of Congress
claiming the right to be released upon the ground that the sentence was imposed in
violation of the Constitution or laws of the United States, or that the court was
without jurisdiction to impose such sentence, or that the sentence was in excess of
the maximum authorized by law, or is otherwise subject to collateral attack, may
move the court which imposed the sentence to vacate, set aside or correct the
sentence.

*United States*, 208 F.3d 27, 30 (2d Cir. 2000); *Rodriguez v. United States*, No. 11-CV-2957, 2013 WL 6171618, at *3 (S.D.N.Y. Nov. 25, 2013), *aff'd*, 679 F. App'x 41 (2d Cir. 2017).

In ruling on a § 2255 petition, the district court is required to hold a hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). Moreover, a hearing is not required where the petitioner's allegations are "vague, conclusory, or palpably incredible." *Machibroda v. United States*, 368 U.S. 487, 495 (1962). To justify a hearing, the petition "must set forth specific facts supported by competent evidence, raising detailed and controverted issues of fact that, if proved at a hearing, would entitle [the petitioner] to relief." *See Gonzalez v. United States*, 722 F.3d 118, 131 (2d Cir. 2013). Finally, because Petitioner is appearing pro se, the Court construes the Petition and his other submissions "liberally and interpret[s] [them] to raise the strongest arguments that they *suggest*." *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (quotation marks omitted); *see also Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("[A] pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." (italics and citation omitted)).

B.  Ineffective Assistance Claim

1.  Standard of Review

As noted, Petitioner claims that his counsel was ineffective. Claims of ineffective assistance of counsel are evaluated under the framework set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). "First, the [petitioner] must show that counsel's performance was deficient." *Strickland*, 466 U.S. at 687. "Second, the [petitioner] must show that the deficient performance prejudiced the defense." *Id.*

A petitioner will not meet the first prong based solely on disagreements with counsel's strategy or advice. Indeed, there is a "strong presumption" that counsel's conduct fell within the

vast spectrum of reasonable assistance, and it is the petitioner's burden to demonstrate "that counsel's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986); *see also Tanveer v. United States*, No. 06-CR-1135, 2019 WL 430262, at *4 (S.D.N.Y. Feb. 4, 2019) (same). Thus, to satisfy this prong, a petitioner must demonstrate that counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment." *Strickland*, 466 U.S. at 687. In assessing counsel's conduct, "a reviewing court must judge his conduct on the basis of the facts of the particular case, 'viewed as of the time of counsel's conduct,' and may not use hindsight to second-guess his strategy choices." *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994) (quoting *Strickland*, 466 U.S. at 690).

To satisfy the second prong, "[the petitioner] must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding below would have been different." *United States v. Caracappa,* 614 F.3d 30, 46 (2d Cir. 2010) (citation omitted, alteration adopted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceeding," as "[v]irtually every act or omission of counsel would meet that test, and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." *Id.* at 693 (citation omitted). "'Purely speculative' arguments about the impact of an error do not establish prejudice." *DeCarlo v. United States*, Nos. 11-CV-2175, 08-CR-523, 2013 WL 1700921, at *4 (S.D.N.Y. Apr. 17, 2013) (alteration adopted) (quoting *United States v. Weiss*, 930 F.3d 185, 199 (2d Cir. 1991)).

10

As for ineffective assistance claims in the context of plea negotiations, the Court begins by noting that criminal defendants do not have a right to "be offered a plea, nor a federal right that the judge accept it." *Missouri v. Frye*, 566 U.S. 134, 148-49 (2012) (citations omitted). However, if a plea offer has been made, "a defendant has the right to effective assistance of counsel in considering whether to accept it." *Lafler v. Cooper*, 566 U.S. 156, 168 (2012). As the Supreme Court has explained:

> [A]s a general rule, defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused. . . . When defense counsel allowed the offer to expire without advising the defendant or allowing him to consider it, defense counsel did not render the effective assistance the Constitution requires.

*Frye*, 566 U.S. at 145. Put another way, an attorney's failure to advise a client of a formal plea offer deprives a criminal defendant from the benefit of the very type of professional advice that is at the core of the right to representation. *See Purdy v. United States*, 208 F.3d 41, 44–45 (2d Cir. 2000) (noting that defense counsel "must give the client the benefit of counsel's professional advice on [the] crucial decision of whether to plead guilty" (citation omitted)). "As part of this advice, counsel must communicate to the defendant the terms of the plea offer, and should usually inform the defendant of the strengths and weaknesses of the case against him, as well as the alternative sentences to which he will most likely be exposed." *Id.* at 45 (internal citation omitted). To establish a Sixth Amendment violation, a defendant must prove that his attorney in fact failed to communicate a plea offer or failed to provide objectively reasonable advice about the decision to plead guilty. *See, e.g.*, *United States v. Gordon*, 156 F.3d 376, 379 (2d Cir. 1998) (noting that the Sixth Amendment right to counsel attaches "after the initiation of formal charges," including "plea negotiations" (citation omitted)); *Godon v. Covlin*, No. 16-CV-5280, 2020 WL 4504682, *7 (E.D.N.Y. Aug. 5, 2020) (same).

Petitioner "b[ears] the burden of proving his claim" of ineffective assistance of counsel, including any factual assertions contained in that claim. *Chang v. United States*, 250 F.3d 79, 86 (2d Cir. 2001). To warrant a hearing, Petitioner "must proffer arguably credible evidence of a *prima facie* case that, but for counsel's improper advice, [Petitioner] would have accepted the plea offer." *Puglisi v. United States*, 586 F.3d 209, 215 (2d Cir. 2009); *see also Dalli v. United States*, 491 F.2d 758, 760 (2d Cir. 1974) ("[T]his court takes a dim view of any summary rejection of a petition for post-conviction relief when supported by a 'sufficient affidavit.' But we have, consistently with that pronouncement, recognized that a judge is well within his discretion in denying a petition when the supporting affidavit is insufficient on its face to warrant a hearing." (citations omitted)).

Even if Petitioner can prove that his attorney provided inadequate advice about a plea offer, he must still "affirmatively prove prejudice." *Strickland*, 466 U.S. at 693. That is, he must prove that there is a reasonable probability that, but for counsel's errors: (1) he would have accepted a plea offer; (2) the plea offer would not have been withdrawn by the prosecution in light of intervening circumstances; (3) the court would have accepted the terms of the plea offer; and (4) "the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed." *Lafler*, 566 U.S. at 164; *see also Frye*, 566 U.S. at 147 ("[D]efendants must demonstrate a reasonable probability they would have accepted the earlier plea offer had they been afforded effective assistance of counsel."). To clear this bar, Petitioner must provide objective evidence beyond his own self-serving, post-conviction statement that he would have pleaded guilty. *See, e.g.*, *Raysor v. United States*, 647 F.3d 491, 495 (2d Cir. 2011) (noting that *prima facie* evidence supporting a prejudice claim "may include a petitioner's own statement," but to "be sufficiently credible to

justify a full hearing, it must be accompanied by some 'objective evidence'"); *cf. Gordon*, 156

F.3d at 380–81 (finding that the defendant in that case had provided objective evidence to

support the post-conviction statements regarding prejudice).  As the Third Circuit has

cautioned, "courts should be wary of this sort of claim because defendants will always want the

best of both worlds: the chance at acquittal at trial, yet the chance to plead guilty if the trial

fails." *United States v. Day*, 969 F.2d 39, 46 n.9 (3d Cir. 1992).  Where such an allegation of

prejudice is "implausible on its face" without any proffer of evidence to support the allegation,

the district court may reject an ineffectiveness claim without a hearing.  *United States v. Bent*,

654 F. App'x 11, 14 (2d Cir. 2016); *see also Goyal v. United States*, Nos. 19-CR-844, 23-CV-

1516, 2025 WL 307236, at *5 (S.D.N.Y. Jan. 27, 2025) ("Where, as here, the record evidence

strongly undermines Petitioner's self-serving, threadbare assertion that he would have accepted

the plea, he has not shown prejudice.").

### 2. First Prong:  Effective Assistance

Petitioner's case hinges on the claim that the Government extended a "verbal" plea

offer that would allow him to plead guilty to a charge with a maximum penalty of 20 years'

imprisonment in exchange for cooperation against Petitioner's co-defendants.  (Pet. at 13.)

Petitioner also asserts that while his counsel (Mr. Smith) conveyed this supposed offer, he

did not advise Petitioner of the potential advantages of pleading guilty.  (*Id.*)  One of the

putative advantages of this verbal plea offer was that Petitioner would receive a three-level

reduction under the U.S. Sentencing Guidelines for acceptance of responsibility.  (*Id.*)  But

for these alleged representation deficiencies, Petitioner unsurprisingly claims he would have

pleaded guilty.  (*Id.* at 14–15).  Before addressing the merits of the Petition, it bears noting

that Petitioner's assertions are not included in a sworn affidavit and are not supported by *any* other evidence.

Beyond lacking any evidentiary support, Petitioner's claim of ineffectiveness is specious on its face and is contradicted by indisputable record evidence. For example, according to Petitioner, the Government extended a verbal plea offer in the same case where it provided written plea offers to every other defendant, *and* this verbal plea offer solicited Petitioner's testimony at the trial of his co-defendants even though all of his co-defendants had already pleaded guilty or had agreed to plead guilty, *and* this unwritten cooperation agreement would only require Petitioner to plead guilty to a count carrying a maximum penalty of 20 years' imprisonment when all other cooperators in the case pleaded guilty to counts carrying a maximum of life imprisonment. (*Id.* at 13.) At every point this claim fails the common sense test and runs headlong into the record.

For example, as to the assertion that Petitioner's counsel was only offered a verbal cooperation agreement, the U.S. Attorney's Office in the Southern District of New York represents that it has a policy that *all* plea offers must be in writing; Petitioner does not contradict this representation. (Gov't Opp'n at 12.) The representation is consistent with the fact that the other defendants pleaded guilty pursuant to written plea agreements, (*id.*), and with Mr. Smith's sworn statement that "the Government never conveyed a plea offer to" him, (Smith Aff. ¶ 2).

Furthermore, the claim that the Government (verbally) expressed an interest in Petitioner cooperating against his co-defendants is undone by the chronology of the pleas in this case. According to the Petition, "[i]n or about April 2017, Troy A. Smith consulted [Petitioner] about the government's 'verbal' plea offer," which included "cooperation

14

[and] testimony at trial of the crimes [and] against other co-defendants." (Pet. at 13.) However, by April 2017, every co-defendant either had already pleaded guilty or was on the verge of pleading guilty. (*See* Dkt. (16-CR-302) (minute entries for proceedings held on 12/9/2016 (Mack), 3/15/2017 (Duncan), 3/29/2017 (unsealed on 10/15/2019) (Lewis), and 4/21/2017 (Renolds)); Tr. for proceedings held on 2/22/17 (Hummel) (16-CR-302); Tr. for proceedings held on 3/9/17 (Davis) (16-CR-302).) Indeed, Herring was the only defendant in the case who went to trial, meaning that there was nobody left for him to testify against at trial.

Beyond the chronological problems with Petitioner's claim, his assertion that the Government (verbally) offered him "a 20 year" cooperation agreement is inconsistent with every other cooperation agreement in this case. (Pet. at 13.) All three of the cooperating witnesses who testified at Herring's trial pleaded guilty to every federal crime they had committed and faced a maximum of life imprisonment. (*See* Tr. 125–26 (Hummel), 382 (Lewis), 806–07 (Mack).) Mark Mack and Jesse Hummel, who were both members of the Askari and participants in the Northcote robbery, each pleaded guilty to Hobbs Act robbery conspiracy, which carries a maximum penalty of 20 years' imprisonment, in violation of 18 U.S.C. § 1951; Hobbs Act robbery, which carries a maximum penalty of 20 years' imprisonment, in violation of 18 U.S.C. §§ 1951 and 2; murder through use of a firearm, which carries a maximum penalty of life imprisonment, in violation of 18 U.S.C. § 924(j); racketeering conspiracy, which carries a maximum penalty of 20 years' imprisonment, in violation of 18 U.S.C. § 1962; and murder in aid of racketeering, which carries a mandatory minimum penalty of life imprisonment, in violation of 18 U.S.C. § 1959(a)(1). (*See, e.g.*, Tr. 125–26 (Hummel identifying charges in his plea agreement), 806–07 (Mack identifying the same).) William Lewis, who was not a member

of the Askari but who participated in the Northcote robbery, pleaded guilty to, among other

crimes, murder through use of a firearm, in violation of 18 U.S.C. § 924(j); and narcotics

conspiracy, in violation of 21 U.S.C. §§ 846, 841(b)(1)(A), each of which carries a maximum

penalty of life imprisonment.  (*See* Indictment (Dkt. No. 154) (16-CR-302); *see also* Dkt. (16-

CR-302) (minute entry for proceedings held on 3/29/2017 (unsealed on 10/15/2019) (Lewis)).)

Simply put, it is illogical and contrary to common sense that the Government would make an

offer (verbally) to allow Petitioner, an Askari leader who himself shot Northcote, to plead to

lesser crimes with lower statutory maximums than his co-defendants, especially given U.S.

Attorney's practice in this case—demonstrated by the above-described pleas—of requiring

cooperating witnesses to plead guilty to all federal crimes they committed.  From the

Government's perspective, and as was made clear during Petitioner's trial, the Government had

compelling evidence that Petitioner was a leader of a violent gang, participated in a violent

home-invasion robbery, held the victim's child at gunpoint during that robbery, and then

murdered that child's father in front of the child.  To (verbally) offer Petitioner such a

"sweetheart" deal under these circumstances simply makes no sense.

Added up, the ledger is as follows:  In Petitioner's corner is his unsworn and

unsubstantiated claim that his lawyer received a verbal offer to have Petitioner testify against his

co-defendants, even though they had pleaded guilty or agreed to plead guilty, and be exposed to

a maximum of only 20 years' imprisonment.  In the opposition's corner is defense counsel's

detailed and eminently credible affidavit, corroborating evidence attached to defense counsel's

affidavit, and the record of other pleas and charging decisions in this case.  In these

circumstances, the Court concludes that Petitioner has utterly failed to establish that his counsel

was ineffective and concludes that there is no need to hold a hearing that "would add little or

16

nothing to the written submissions." *See Chang*, 250 F.3d at 86 (affirming denial of ineffective assistance of counsel claim without a hearing where defendant's claim was "based solely on his own highly self-serving and improbable assertions" and contradicted by "eminently credible" affidavit from defense counsel and record evidence); *see also Puglisi*, 586 F.3d at 218 (affirming district court's denial of ineffective assistance claim without a hearing where defendant's assertions of fact were not contained in a sworn affidavit, were unsupported by "any objective evidence," and were "undermine[d]" by "record evidence").

Second, Petitioner's assertion that the potential three-level reduction for acceptance of responsibility under the Guidelines would have affected his decision to go to trial is based on a mistaken understanding of the relationship between statutory penalties and the Guidelines. While Petitioner does not explain exactly how the supposed verbal plea offer would result in a twenty-year sentence of imprisonment, the cleanest way to such a result would be through a plea either to the robbery conspiracy charge in Count One or the robbery charge in Count Two, each of which carried a maximum penalty of 20 years. *See* 18 U.S.C. § 1951 and 2. Because both of those counts covered conduct that resulted in the first degree murder of Northcote, the murder Guidelines would have applied to both counts. *See* U.S.S.G. § 2B3.1(c)(1) ("If a victim was killed under circumstances that would constitute murder under 18 U.S.C. § 1111 had such killing taken place within the territorial or maritime jurisdiction of the United States, apply §2A1.1 (First Degree Murder)."). Under U.S.S.G. § 2A1.1, the base offense level for either offense would have been 43. Even assuming that there were no additional enhancements, and even with a three-level reduction for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1, the lowest offense level for either offense would have been 40. Because Petitioner was in Criminal History Category IV (*see* PSR ¶¶ 47–53), an offense level of 40 results in a Guidelines range of 30 years

to life imprisonment. *See* U.S.S.G. Chapter 5, Part A (Sentencing Table). Pursuant to U.S.S.G. § 5G1.1(a), the Guidelines sentence would therefore become the statutory maximum of 20 years' imprisonment. There would be no further reduction below that 20-year maximum for acceptance of responsibility. In other words, the three-level reduction would have had no conceivable impact on the sentence Petitioner could have received under a "20 year plea deal."

Thus, even if such a plea offer were extended, verbally or in writing, and even if Mr. Smith failed to explain the three-level reduction for acceptance of responsibility, the absence of any information about the three-level reduction could not have had any impact on the decision about whether to accept the offer. Even crediting his self-serving assertions, Petitioner has failed to demonstrate that counsel's performance was unreasonable. Thus, for this independent reason, Petitioner fails to establish the need for a factual hearing or to satisfy *Strickland*'s first prong.

### 3. Second Prong: Prejudice

Aside from failing to establish ineffectiveness, Petitioner has not demonstrated any prejudice required by the second prong of *Strickland*. Even if all of Petitioner's specious claims about counsel's performance were true, he has failed to satisfy his burden of providing "objective evidence" that he would have accepted the plea agreement had he been properly advised. *Raysor*, 647 F.3d at 495 (citation omitted).

As discussed above, Petitioner claims that if he had been advised of the benefits of pleading guilty, including a potential reduction in his Guidelines offense level for acceptance of responsibility, he would have pleaded guilty instead of proceeding to trial. (Pet. at 14–15). As was the case with his ineffective assistance claim, this claim is unsupported by any affidavit or other evidence and is therefore insufficiently reliable to support a finding of prejudice or to merit a hearing on this issue. *See Puglisi*, 586 F.3d at 218 (affirming denial of habeas petition based

on ineffective assistance claim without a hearing where petitioner failed to "proffer[] objective evidence in support of" his assertion that he would have accepted a plea offer if properly advised by counsel); *Chang*, 250 F.3d at 86 (affirming dismissal of ineffective assistance claim that was supported only by "highly self-serving and improbable statements"); *Velasquez v. United States*, Nos. 15-CR-174, 20-CV-4328, 2024 WL 2853268, at *7 (S.D.N.Y. June 5, 2024) (rejecting prejudice claim without a hearing where defendant's assertions were "palpably incredible").

Furthermore, Petitioner's assertion that he would have accepted this supposed plea offer is belied by his resolute denial under oath at trial that he participated in any robbery conspiracy, the robbery of Michael Northcote, or the murder of Michael Northcote. At trial, Petitioner repeatedly testified, under oath, that he was innocent because he was totally unaware of the crimes his co-defendants committed, believed that the plan was merely to burglarize Northcote's home, and refused entirely to participate once he learned that the crime had converted into a robbery. Indeed, Petitioner insisted that he remained outside of Northcote's home throughout the robbery and had nothing whatsoever to do with either the execution of the robbery or Northcote's death. Thus, the post-conviction assertion that Petitioner would have admitted at a plea that he in fact participated in the Northcote robbery, and, most importantly, shot and killed Michael Northcote, strains credulity. *Cf. United States v. Hernandez*, 242 F.3d 110, 112–113, 114 (2d Cir. 2001) (rejecting factual assertions in habeas petition that were contradicted by petitioner's sworn statements at plea allocution); *Vargas v. United States*, No. 00-CV-2275, 2007 WL 2246004, at *9 (E.D.N.Y. July 31, 2007) (same).

On this point, the Court views Petitioner's credibility with added skepticism, given that it applied an obstruction of justice enhancement at sentencing based on a finding that Petitioner repeatedly perjured himself during his trial testimony. (Tr. of proceedings held on 11/30/17 9–

19

10 (Dkt. No. 119, 16-CR-302).)  And, it is no stretch to conclude that Petitioner's motive for

lying on the stand is the same motive for lying in supporting his Petition—to avoid life in prison.

Given Petitioner's prior false testimony, as well as the complete lack of any affidavit or evidence

to support the assertions in the Petition, the claim of prejudice lacks any factual basis.

Because Petitioner's prejudice claim is based entirely on unsubstantiated assertions

and is "implausible on its face," *Bent*, 654 F. App'x at 14, and because he cannot

demonstrate a reasonable probability that he would have accepted the verbal plea offer, even

if it existed, Petitioner fails to meet his burden of establishing prejudice under the second

prong of *Strickland*.  *See Lafler*, 566 U.S. at 164.  Accordingly, the Court concludes that no

hearing is necessary and that ineffective assistance claim lacks merit.

### C. Hobbs Act – Crime of Violence

Finally, Petitioner contends that Hobbs Act robbery in violation of 18 U.S.C. § 1951

does not qualify as a "crime of violence" under 18 U.S.C. § 924(c)(3)(A) because, he argues,

a robbery could be committed without any use of force.   (Pet. at 4.)  The Second Circuit

rejected this same argument during Petitioner's direct appeal, in light of its prior ruling in

*United States v. Hill*, 890 F.3d 51, 53 (2d Cir. 2018), by which it was bound "until such time

as [prior rulings] are overruled either by an en banc panel of [the Second Circuit] or by the

Supreme Court."  *See United States v. Herring*, 754 F. App'x 67, 69 (2d Cir. 2019) (quoting

*United States v. Wilkerson*, 361 F.3d 717, 732 (2d Cir. 2004)).

The Second Circuit denied Herring's direct appeal in February 2019.  *See id.* at 67.

In June 2019, the Supreme Court decided *United States v. Davis*, 588 U.S. 445, 452–54

(2019), in which it held that the residual clause defining a crime of violence in § 924(c)(3)(B)

was unconstitutionally vague.   The *Davis* decision has no effect, however, on

§ 924(c)(3)(A), the relevant provision here.   In fact, since *Davis*, the Second Circuit has

reaffirmed its ruling in *Hill* that a substantive Hobbs Act robbery offense qualifies as a crime

of violence under § 924(c)(3)(A).   *See United States v. Barrett*, 102 F.4th 60, 82 (2d Cir.

2024) (rejecting argument that Supreme Court's decision in *United States v. Taylor* that

attempted Hobbs Act robbery was a crime of violence undermined earlier decisions regarding

substantive Hobbs Act robbery, noting that ten circuit courts concurred) (omitting citations);[6]

*United States v. McCoy*, 58 F.4th 72, 74 (2d Cir. 2023) ("Defendants here have presented no

hypothetical case in which a Hobbs Act robbery could be committed without the use,

attempted use, or threatened use of force against another person or his property."); *United*

*States v. Hill*, 743 F. Supp. 3d 462, 464 (E.D.N.Y. 2024) ("In the Second Circuit, a complete

Hobbs Act robbery remains a crime of violence . . . .").   Petitioner's repeat claim that Hobbs

Act robbery does not qualify as a crime of violence is contrary to binding legal authority and

must be rejected under the controlling law of the Second Circuit.

### III.  Conclusion

For the foregoing reasons, the Petition is dismissed with prejudice.

As Petitioner has not made a substantial showing of the denial of a constitutional right, a

Certificate of Appealability shall not be issued, *see* 28 U.S.C. § 2253(c)(2); *Lucidore v. N.Y.*

*State Div. of Parole*, 209 F.3d 107, 111–12 (2d Cir. 2000), and the Court further certifies,

pursuant to 28 U.S.C. § 1915(a)(3), that an appeal from this judgment on the merits would not be

taken in good faith, *see Coppedge v. United States*, 369 U.S. 438, 445 (1962) ("We consider a

---

[6] Further, the Defendant in *Barett* petitioned the Supreme Court for certiorari on the precise question that Petitioner raises here, *see* Petition for Writ of Certiorari, *Barrett v. United States*, 145 S. Ct. 1307 (2025) (No. 24-5774); the Supreme Court declined to grant certiorari on the question, *id*., 145 S. Ct. 1307 (Mem.).

defendant's good faith . . . demonstrated when he seeks appellate review of any issue not frivolous."); *Burda Media Inc. v. Blumenberg*, 731 F. Supp. 2d 321, 322–23 (S.D.N.Y. 2010) (citing *Coppedge* and concluding that an appeal may not be taken in forma pauperis if the trial court certifies in writing that it is not taken in good faith).

The Clerk of Court is respectfully directed to enter judgment for Respondent in Case No. 20-CV-9752, close Case No. 20-CV-9752, terminate the motions pending at Dkt. Nos. 184 and 205 in Case No. 16-CR-302, and mail a copy of this Opinion to Petitioner.

SO ORDERED.

Dated:    November 6, 2025
          White Plains, New York

_____
            KENNETH M. KARAS
         United States District Judge